Eva WHITE and Evelyn C. Parchment, Trustees of the Martha Baker Family Trust, Appellants

v.

Lucy SARGENT, Appellee.

Nos. 03–PR–1017, 04–PR–553.

District of Columbia Court of Appeals.

Argued May 3, 2005.

Decided June 2, 2005.

Darrel S. Parker, for appellant White.

Lauckland A. Nicholas, with whom Evelyn C. Parchment, Washington, DC, was on the brief, for appellant Parchment.

Laird Hart, for appellee.

Christopher J. Herrling, guardian ad litem, for the minor children.

Before TERRY, REID, and WASHINGTON, Associate Judges.

TERRY, Associate Judge:

In these consolidated appeals, appellants Eva White and Evelyn Parchment challenge the trial court's decision to grant summary judgment in favor of appellee Lucy Sargent. The trial court held that the trust created by her late husband, Ernest Sargent, was null and void because it was created for the fraudulent purpose of concealing assets and because it resulted in an improper circumvention of Mrs. Sargent's marital rights. We agree with the trial court's ruling and the reasons behind it, and accordingly we affirm the judgment.

I

Ernest and Lucy Sargent married each other twice, first in June of 1991 and again in December of 1995. The couple had two children together: Mary, who was born shortly after the dissolution of the first marriage, and Angelique, who was born during the second marriage.[1] In June 1992 Mr. Sargent filed for divorce, after Mrs. Sargent sued for a civil protection order; a final decree of divorce was entered soon thereafter. Because of the short duration of the marriage and the court's finding that Mrs. Sargent was able to work, the court denied Mrs. Sargent's request for permanent alimony, but ordered Mr. Sargent to pay child support for Mary.[2] One issue during that proceeding was the net value of Mr. Sargent's assets. He denied ownership of certain bank accounts and certificates of deposit, with a total value of approximately $460,000, instead claiming that he merely had power of attorney over them. The court found as a fact, however, that Mr. Sargent owned those funds, that he had "deliberately divested himself of those assets on paper," and that his testimony regarding the assets was "neither credible nor supported by the record evidence."

The Sargents remarried on December 12, 1995, and had a second child, Angelique, approximately nine months later. During the course of that marriage, Mr. Sargent insisted that Mrs. Sargent stay home and care for Mary and Angelique. The couple separated in early November of 1997. This time, it was Mrs. Sargent who filed for divorce in May of 1998, and in that action she requested both child support and alimony. At issue again was the amount of assets held by Mr. Sargent, who testified in July of 1998 that he had a

---

**1.** Mr. Sargent also had three adult children from a previous marriage, but they are not parties to this appeal.

**2.** The court also found that Mr. Sargent physically and emotionally abused Mrs. Sargent during the course of the marriage. Moreover, he "did not contribute one penny for the support of his child [Mary], either voluntarily or under court order, until March 1, 1993—almost eight months after he learned of her birth."

negative net worth and did not own or have an interest in any substantial financial assets. Nevertheless, in an October 1998 support order, a Magistrate Judge of the Superior Court found that Mr. Sargent had "significant assets from which he earn[ed] additional income above the amount he [had] reported to the Court." [3] Mr. Sargent's monthly child support obligation was thus increased.[4]

During the pendency of the 1998 child support proceedings, Mr. Sargent created the Martha Baker Family Trust ("the trust") on August 4, 1998. The corpus of the trust consisted mainly of annuities. The original beneficiaries of those annuities had been Mr. Sargent's young daughters, Mary and Angelique. Upon creation of the trust, however, Mr. Sargent redesignated the trust itself as the sole beneficiary of the annuities. The declaration of trust named Eva White and Evelyn Parchment as trustees.[5] Its "primary purpose" was "to provide for the education and health care of [Mary and Angelique]," as well as to "allow [Mr. Sargent] to live in the community for as long as possible and to ensure maximum level medical . . . care for [him] during [his] lifetime . . . ." In addition, the declaration of trust directed the trustees, upon Mr. Sargent's death, to rename the trust the "Ernest E. Sargent Trust." [6] Mr. Sargent retained the power to obtain, from the trustees, as much of the income and principal as he desired during his lifetime. He also retained the power to amend the trust and change the trustees.

Mr. Sargent died on January 30, 2001. At the time of his death, he and Mrs. Sargent were still legally married, since the divorce proceeding was still pending.[7] Mrs. Sargent filed this suit for declaratory and equitable relief in November 2001, alleging that the trust agreement "constituted an improper attempt to evade and circumvent [her] marital rights and should be rescinded and/or reformed." She stated in her complaint that, "[u]nless set aside, the effect of the purported transfer is to deprive [her] of her statutorily protected interest in the decedent's property and leave [her] without any means of support." The trustees filed a counter-complaint for declaratory relief on the ground that "the assets of the Martha Baker Family Trust are not part of the estate of Ernest E. Sargent" because they were Mr. Sargent's "sole and separate property." Thus, they claimed, Mrs. Sargent had "no rights or interests in the assets."

After the close of discovery, Mrs. Sargent filed a motion for summary judgment, asserting that the trust was invalid. The trustees opposed the motion; in addition, Ms. White filed a cross-motion for summary judgment. In a fifteen-page order filed on August 7, 2003, the trial court

3. Indeed, Mr. Sargent claimed ownership of those same assets—roughly $450,000—in 1992, when he signed an affidavit of support so that Mrs. Sargent could enter the United States from the Philippines.

4. The divorce action was subsequently dismissed for lack of prosecution. Mr. Sargent re-filed for divorce in September of 2000.

5. Ms. White is Mr. Sargent's sister. Ms. Parchment, an attorney, represented Mr. Sargent in the 1994 divorce and child custody litigation.

6. That trust, also established "for the primary benefit of [Mr. Sargent's] minor children," "shall incorporate all the relevant terms included in [the Martha Baker Family Trust Agreement] . . . ."

7. Mr. Sargent's Last Will and Testament, executed on September 20, 1998, stated that if, at the time of his death, he had not obtained a divorce from Mrs. Sargent, she would receive a bequest of $100.

granted Mrs. Sargent's motion for summary judgment. It declared the trust null and void because it had been established to conceal Mr. Sargent's assets and to circumvent Mrs. Sargent's marital rights. The court therefore ruled that "the trust monies become part of Mr. Sargent's estate and Mrs. Sargent can claim her elective share ...."[8] These appeals followed.

## II

Appellant White's primary claim on appeal is that the trial court erred in granting summary judgment in favor of Mrs. Sargent. She also contends that the court abused its discretion in assigning the trust assets to Mr. Sargent's estate after it declared the trust void.

■ Appellant Parchment makes essentially the same arguments. Ms. Parchment, however, failed to note an appeal from the order of August 7, 2003, granting summary judgment. Instead, after Ms. White noted her appeal, Ms. Parchment filed a motion in the trial court for reconsideration of its order, citing only "Super. Ct. Civ. Rule 59 and 60."[9] This motion was denied on November 26, 2003, but Ms. Parchment did not note an appeal from that denial. Later, on April 2, 2004, Ms. Parchment requested re-entry of the order denying reconsideration, alleging that she had never been served with a copy of the November order. The trial court, in an

order entered on April 7, 2004, concluded that the November 26 order "was never docketed," and thus, "for the purpose of clarification," it denied (once again) Ms. Parchment's original motion for reconsideration. Ms. Parchment filed a timely notice of appeal from that denial.

Under this court's rules, the timely filing of a Rule 59(e) motion (and Ms. Parchment's motion appears to have been timely) tolls the time for filing a notice of appeal from the original judgment, so that the time for noting such an appeal begins to run again from the entry of the order disposing of the Rule 59(e) motion. *See* D.C. Ct.App. Rule 4(a)(iii). This means that Ms. Parchment's appeal encompasses not only the denial of the Rule 59(e) motion but the original judgment as well, and that her arguments on the merits are properly before us.

We turn, accordingly, to the merits.

## III

Summary judgment is proper when the court, viewing the facts in the light most favorable to the non-moving party, concludes from the record—including "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits"—that "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Super. Ct. Civ. R. 56(c). The moving party has the initial burden of

8. That elective share is guaranteed and protected by D.C.Code § 19–113 (2001).

9. Because the Superior Court Rules do not provide for a "motion for reconsideration," we must look to the motion itself to ascertain whether it was filed under Rule 59 or Rule 60. "The nature of a motion is determined by the relief sought, not by its label or caption." *Wallace v. Warehouse Employees Union,* 482 A.2d 801, 804 (D.C.1984) (citations omitted). We conclude that Ms. Parchment's motion

was filed only under Rule 59(e), since it merely maintained that the court had erred in its assessment of the case and reargued points on which the court had already ruled. It did not say anything about newly discovered evidence, nor did it offer any other ground which might have warranted relief under Rule 60(b). *See generally Amatangelo v. Schultz,* 870 A.2d 548, 553–554 (D.C.2005) (discussing the difference between a Rule 59(e) motion and a Rule 60(b) motion).

demonstrating that there are no material facts in dispute and that it is entitled to judgment as a matter of law. *Wyman v. Roesner,* 439 A.2d 516, 519 (D.C.1981). "Once the movant has made a prima facie showing, however, the opposing party, to prevail, must rebut with specific evidence." *Id.* (citations omitted); *accord, e.g., Kibunja v. Alturas, L.L.C.,* 856 A.2d 1120, 1127–1128 (D.C.2004).

Appellants argue that the trial court erred when it granted summary judgment in favor of Mrs. Sargent. In particular, they maintain that genuine issues of material fact exist regarding Mr. Sargent's motive and intent in creating the trust, and that the trial court erred in its application of the factors discussed in *Windsor v. Leonard,* 154 U.S.App. D.C. 348, 475 F.2d 932 (1973).[10]

### A. Concealing Assets

The trial court found that "Mr. Sargent took pains to shield his assets to avoid paying alimony while his second divorce was pending." In determining that he act-

ed with fraudulent intent, the court looked to his credibility,[11] noting that, although he had twice denied under oath that he had substantial assets, "the very existence of the trust valued at approximately $543,000 diminishes Mr. Sargent's credibility as to his financial status." The court also noted that Mr. Sargent was "known to have 'unclean hands' in the past," citing his misrepresentations about his assets in the original divorce proceeding. Thus the court concluded that Mr. Sargent "lacked good faith in establishing the trust."[12]

■ Even when the evidence is viewed in the light most favorable to the appellants, the trial court did not err in so holding. The record reveals that, during the first divorce proceeding in the early 1990s, Mr. Sargent denied ownership of assets totaling approximately $460,000, and the court at that time (in 1994) found that he did in fact own those funds, that he had "deliberately divested himself of those assets on paper," and that his testimony regarding those assets was "neither credi-

---

**10.** Ms. Parchment asserts in her reply brief that this court in *In re Estate of Blake,* 856 A.2d 1151 (D.C.2004), held that the *Windsor* case has been "superseded" by recent legislative changes in the probate code. We disagree. The *Blake* case dealt with the ownership of joint bank accounts. It did not involve a claim that a trust was invalid or established for an improper purpose, nor did it present any issue regarding the rights of a surviving spouse. The *Windsor* case is not even mentioned in the *Blake* opinion. We are satisfied that *Blake* is inapposite here. Nor do we see anything in *In re Estate of Delaney,* 819 A.2d 968 (D.C.2003), also cited in the same reply brief, which might have a bearing on this case.

**11.** Ms. White contends that the trial court "erred in deciding a motion for summary judgment based on the credibility of the decedent." According to her brief, "[t]he Trial Court's determination [based upon a past domestic relations proceeding] that decedent had a willingness to lie under oath should not

automatically result in a finding that the Trust was fraudulent." We do not read the record so narrowly. In the first place, we discern no error in the trial court's reliance on *judicial findings* (not merely on Mr. Sargent's testimony) in prior proceedings on a related matter, namely, the financial support of his minor children. Moreover, it is clear that the court did not rely solely on Mr. Sargent's credibility—or lack thereof—in granting summary judgment. Rather, the court properly considered the entire record, including evidence introduced by Mrs. Sargent from the prior divorce proceedings and financial statements provided by both parties, in ruling on her motion.

**12.** Though these findings related to the "motive" factor in *Windsor,* discussed in the next section of this opinion, it is apparent that the court also took them into account in concluding that Mr. Sargent had deliberately concealed assets from the court in the earlier proceeding.

ble nor supported by the record evidence." In fact, Mr. Sargent conveniently claimed ownership of those assets in 1992, when he signed an affidavit of support so that Mrs. Sargent could enter the United States from her native country, the Philippines. Mr. Sargent again denied ownership of those assets in 1998, however, during the second divorce proceeding. The judge in that case also found that Mr. Sargent had "significant assets from which he earn[ed] additional income above the amount he [had] reported to the court." Appellants presented no evidence to rebut these findings, though they contest them on appeal. "[M]ere conclusory allegations or denials," however, are insufficient to defeat a motion for summary judgment. *Chang v. Institute for Public–Private Partnerships,* 846 A.2d 318, 323 (D.C.2004); *accord, e.g., Musa v. Continental Insurance Co.,* 644 A.2d 999, 1002 (D.C.1994).

Ms. White nevertheless claims that "there were material facts in dispute which demanded a full evidentiary hearing" to determine Mr. Sargent's motive and intent in setting up the trust. She argues that the trial judge based his finding that Mr. Sargent intended to conceal his assets "upon his misinterpretation of the Domestic Relations record ...." Specifically, she claims that "there was no outstanding litigation over alimony," and thus it was error for the judge to determine that Mr. Sargent sought to avoid paying alimony by concealing his assets from the court since alimony was not at issue. This is simply incorrect. Mrs. Sargent's May 1998 com- plaint for absolute divorce clearly stated that she sought alimony from Mr. Sargent. Because Mr. Sargent established the trust in August of 1998, during the pendency of the second divorce proceeding, there can be no question that he created it while alimony was at issue.

## B. *Circumvention of Marital Rights: The Windsor Factors*

In *Windsor v. Leonard,* the decedent established a revocable trust prior to her death and transferred $190,000 of her assets to the trust, the beneficiaries of which were various friends and charities. After her death, her husband renounced his rights under her will and elected instead to take one-half of her "net estate" under D.C.Code § 19–113. He claimed that the $190,000 in the trust should be included in his wife's "net estate" for the purpose of determining his statutory share. The *Windsor* court, noting that courts are generally "hesitant to set aside such transfers if they were made in good faith," laid out the " 'controlling rules' to be applied in determining whether or not an inter vivos transfer is an improper circumvention of the marital rights of the surviving spouse ...."[13] 154 U.S.App. D.C. at 349, 475 F.2d at 933. They are: (1) the "completeness" of the transfer; (2) the motive for the transfer; (3) participation by the transferee in the alleged fraud on the surviving spouse; (4) the amount of time between the transfer and the decedent's death; and (5) the degree to which the surviving spouse is left without an interest in the decedent's property

**13.** The court in *Windsor* did not address whether each factor must be separately favorable to the surviving spouse in order to show that an inter vivos transfer is an improper circumvention of that spouse's marital rights. Because the ultimate issue is whether the transfer was made in good faith, a "totality of the circumstances" analysis seems most appropriate. Thus it was not necessary in this case for Mrs. Sargent to show that each factor was favorable to her position in order for the court to find that the trust was created to circumvent her marital rights (and, indeed, the court did not conclude that each factor favored Mrs. Sargent), so long as the totality of the circumstances established that the trust was created for an improper purpose.

or other means of support. *Id.* at 350, 475 F.2d at 934 (citing *Whittington v. Whittington*, 205 Md. 1, 106 A.2d 72 (1954)). In the case at bar, the trial court considered all of these factors and concluded that the trust was established for the purpose of circumventing Mrs. Sargent's marital rights. Appellants challenge the court's rulings with regard to the *Windsor* factors.[14] We address each one in turn.

**■** 1. *Completeness of the transfer.* Appellants assert that the trial court "misapplied the law in *Windsor*." With regard to completeness, however, the court determined that the transfer was, in fact, complete, even though Mr. Sargent "retained the right to receive income, draw from principal, change trustees, and amend the terms of the trust." Appellants do not appear to contest this ruling.[15]

2. *Motive for the transfer.* The trial court stated that "[t]he record illustrates several factors that suggest Mr. Sargent may have had a fraudulent motive when he created the trust." As noted above, those factors included "the timing of the establishment of the trust" (because it was created "in the midst of a dispute over child

support and permanent alimony during the second divorce proceeding") and Mr. Sargent's lack of credibility on the subject of his finances. Viewing the record in the light most favorable to appellants, we find no error in the court's ruling. The record shows that Mr. Sargent lied (two judges so found) about the amount and value of assets in his possession during both the first and the second divorce proceedings. Moreover, his Last Will and Testament— also prepared during the pendency of the second divorce—reveals a motive to prevent Mrs. Sargent from obtaining any of his assets upon his death. He left her only $100 and directed that "under no circumstances shall the minors' mother ... be allowed to serve or be designated as a guardian of the property, trustee, or in any other fiduciary capacity over the assets flowing from me directly or through my estate or any trust agreement to my minor children herein." In light of this record, the trial court did not err when it concluded that Mr. Sargent "may have had a fraudulent motive" to circumvent Mrs. Sargent's marital rights when he created the trust.[16]

14. Indeed, Ms. White questions whether *Windsor* even applies because it is "silent as to whether the assets used to fund the trust were marital property," and because it did not "involve non-probated proceeds from contracts." For two reasons we are satisfied that *Windsor* controls here. First, it is of no moment whether the property in this trust— or the trust in *Windsor*—was "marital." D.C.Code § 19–113, which governs descent and distribution, sets forth the rights of the surviving spouse and children to the decedent's estate irrespective of the nature of the property. Whether the property is "marital" or not is relevant only in divorce proceedings. *See* D.C.Code § 16–910 (2001). That is not a factor in the instant case, since the Sargents were still legally married when Mr. Sargent passed away. Second, it is irrelevant that the corpus of the trust in this case consisted primarily of annuities, as we shall discuss in part IV of this opinion.

15. We observe, in any event, that "where [a husband] does not part with dominion over the property transferred, the issue of good faith is immediately raised." *Mushaw v. Mushaw*, 183 Md. 511, 519, 39 A.2d 465, 468 (1944).

16. Appellants presented no evidence to rebut the evidence of Mr. Sargent's fraudulent motive except an affidavit from Sharon Smith, a Vice President and Investment Officer at Wachovia Securities. Ms. Smith stated that Mr. Sargent expressed to her a desire to provide financially for his two young daughters and inquired about setting up a trust. This affidavit shows only that Mr. Sargent contemplated creating a trust; it certainly does not rebut Mrs. Sargent's evidence tending to show that he created the trust during the divorce proceedings with the intent to deprive his wife of any interest in his assets. *See Kibunja*, 856 A.2d at 1127–1128; *Wyman*, 439 A.2d at 519.

Ms. White contends that, in order to support her claim of fraudulent intent, Mrs. Sargent "must show that she had an equitable or legal interest in the assets transferred and that the transfer was made to deprive her of these rights, or that she detrimentally relied on any representations of the decedent as to the transfer of his assets." Additionally, she maintains that Mrs. Sargent "was required to prove that [Mr. Sargent] induced her to surrender any legal or equitable rights to the trust property to come within the definition of fraud." These arguments fail. First, Mrs. Sargent had no obligation to show that she had any equitable or legal interest in the trust assets because, as we have already stated, *supra* note 14, her ownership of the property would be relevant only in divorce proceedings, whereas at issue here are her rights as a surviving spouse to property *owned by her deceased husband.* Second, as Mrs. Sargent correctly points out in her brief, "the 'fraud on marital inheritance rights' doctrine does not require fraud in the classic sense, but refers to any inter vivos transfer that is deemed an improper circumvention of the marital rights of the surviving spouse." As one commentator has stated, "Fraud in this context has no definite meaning; it is a statement of the result of the cases which invalidate the transfer rather than a reason for reaching it." Sykes, *Inter Vivos Transfers in Violation of the Rights of Surviving Spouses,* 10 MARYLAND L. REV. 1, 7 (1949).

3. *Participation in the fraud by the transferee.* This factor is not at issue in this case. The trial court found, and the parties agree, that the trustees did not participate in the fraud against Mrs. Sargent.

4. *"Brink of death" transfer.* Mr. Sargent created the trust in August 1998 and died almost two and a half years later, in January 2001. The trial court held that, while "twenty-nine months is more than ample time in which to transfer assets to a trust and to do so in good faith, other factors prevent the court from holding that this transfer was in good faith." In particular, the court focused on the fact that Mr. Sargent knew he was in poor health when he created the trust, and that he lived "in fear of sudden death." The evidence supports the court's conclusion. Most notably, the court had before it a complaint in a medical malpractice action which Mr. Sargent filed in December 1991 against George Washington University Hospital. In that complaint, Mr. Sargent alleged that after suffering a cardiac arrest and two strokes, he was aware that his "current heart failure and disability ... [was] irreversible, and [he was] now subjected to sudden death."

Appellants failed to rebut this evidence. On appeal, Ms. White states in her brief that "[w]hile it is true that [Mr. Sargent] had a history of medical illness, the creation of the trust for the purpose stated, primarily to provide for long term care, support, and education of his two minor children, is consistent with his stated intent to individuals who knew him well." But the only evidence before the trial court on the subject of "his stated intent to individuals who knew him well" was the affidavit from Ms. Smith mentioned in footnote 16, *supra.* That affidavit was not sufficient to rebut Mrs. Sargent's showing that the transfer was made in contemplation of death. On the evidence presented, the trial court could reasonably conclude that the creation of the trust was a "brink of death" transfer.

5. *Degree to which the surviving spouse is left without support.* Finally, the court concluded that "[w]ithout any assets assigned to the trust, Mrs. Sargent has essentially no means of support." Ap-

pellants do not seriously dispute this; indeed, Ms. White acknowledges in her brief that "reinstating the trust will leave a modest estate from which the surviving spouse can claim a share." She nonetheless asserts that, "given the totality of the circumstances, this factor should not be controlling." Specifically, she contends that the trial court should have explored whether this result was "neutralized" by the fact that, in the first divorce proceeding, Mrs. Sargent was denied permanent alimony, and the further fact that, at the time of the creation of the trust, the Sargents were "separated and seeking divorce."

These facts, however, are irrelevant to the *Windsor* analysis. The primary question is whether the trust was created in bad faith in order to circumvent Mrs. Sargent's marital rights, not whether Mrs. Sargent would have been entitled to alimony payments from Mr. Sargent had their divorce become final before he died. Given the evidence of record, it is irrefutable that, because almost all of Mr. Sargent's assets were in the trust, Mrs. Sargent would have been left with virtually nothing. The trial court did not err in so finding, particularly in light of the fact that Mrs. Sargent stayed home to care for the children at her husband's insistence and therefore accrued no assets of her own.

We hold, therefore, that the trial court correctly applied the factors set forth in the *Windsor* case. Its conclusion that Mr. Sargent did not act in good faith in establishing the trust is well supported by the evidence of record.

## IV

█ Finally, appellants maintain that the trial court erred in ruling that the corpus of the voided trust should become part of Mr. Sargent's estate. In particular, they contend, annuity contracts such as the ones involved here cannot be part of a decedent's estate. Rather, Ms. White asserts in her brief that if this court determines that the trust is indeed void, "proceeds paid under the annuity contracts should revert to the prior designated beneficiaries [Mary and Angelique]" and not to the probate estate.

There appears to be no case law in the District of Columbia directly on point, but other courts have ruled as follows:

> [W]here the effect of an inter vivos trust is to remove assets from the decedent's estate that would otherwise have been available for the surviving spouse's distributive share, and the decedent has reserved to himself the practical attributes of ownership of the trust property for his lifetime, the trust property may be subject to claims made by the surviving spouse under the laws regulating succession to decedents' estates.

*Staples v. King*, 433 A.2d 407, 410 (Me. 1981) (citing *Newman v. Dore*, 275 N.Y. 371, 9 N.E.2d 966 (1937)).[17] In *Staples* a surviving widow, who was not a beneficiary of trusts established by her husband, sought to have the trusts declared void and the corpora of the trusts included in her husband's estate to be available for her distributive share. The trial court dismissed her complaint for failure to state a claim upon which relief could be granted, but the Supreme Court of Maine reversed the dismissal and remanded the case for further proceedings. The court held that "Mrs. Staples was entitled to have her

---

**17.** In addition to *Newman*, which it recognized as "the case most often cited" on this subject, 433 A.2d at 410, the *Staples* court cited cases from seven other states in support of its holding, along with a well-known treatise on trusts and an A.L.R. annotation. *See id.* at 411.

husband's trusts declared invalid as against her upon proof that when he executed the trusts he did not intend to relinquish ownership of the trust property . . . ." *Id.* at 411. This is precisely the situation here. Mr. Sargent created a trust in which he retained the right to withdraw "as much of the income and principal" as he requested, as well as the power to amend the trust. Because nearly all of his assets were transferred to the trust, the practical effect was to leave his estate virtually insolvent. Thus it was proper for the trial court to order that the trust property be included in Mr. Sargent's estate and be subject to Mrs. Sargent's statutory share.

Furthermore, it makes no difference, contrary to appellants' contentions, that the corpus of the trust consisted primarily of annuities.[18] As the guardian *ad litem* points out, at the time of Mr. Sargent's death, the designated beneficiary of the annuities was the trust itself. The annuities cannot simply revert to the earlier named beneficiaries, Mary and Angelique, because the act of changing the beneficiary of the trust revoked any prior beneficiary designations. Thus, if the trust is void for the reasons stated by the trial court (and we hold that it is), the property contained in the trust "may be subject to claims made by the surviving spouse under the laws regulating succession to decedents' estates," regardless of the nature of the property.[19] *Staples,* 433 A.2d at 410.

## V

Our holding is twofold. First, because the designated beneficiary of the annuities was the trust, and because the trust is now a nullity, the annuities have no designated beneficiary and therefore must be deemed an asset of Mr. Sargent's estate. Second, Mrs. Sargent is entitled to claim her statutory share of Mr. Sargent's estate, including the annuities. Assuming that she makes such a claim (if she has not done so already),[20] we leave it to the trial court, either in the instant case or in the ongoing probate proceedings, to determine the details of how the estate's assets—including the annuities—shall be distributed, making sure that Mrs. Sargent receives her full statutory share.

The trial court's order granting summary judgment in favor of Mrs. Sargent and directing the co-trustees to transfer the voided trust's assets to Mr. Sargent's estate is in all respects

*Affirmed.*

---

18. Appellants rely on *Jackson v. District of Columbia Police & Firefighters Retirement & Relief Board,* 717 A.2d 904 (D.C.1998), for the proposition that annuity contracts are not part of a decedent's estate. That case, however, dealt specifically with whether an "annuity" specifically created by statute for the surviving spouses of police officers and firefighters is "a property interest of the [decedent] or, instead, an inchoate interest of the potential annuitant." *Id.* at 907. The holding was limited to this type of "survivor annuity" associated with a person's employment—more akin to a pension than a standard annuity—and did not deal with other types of annuities. We conclude that *Jackson* has no effect on the instant case.

19. Indeed, as Mrs. Sargent observes in her brief, to hold otherwise would make little practical sense: "It would be utterly illogical to hold, on the one hand, that the 'trust' was unlawful because it constituted a circumvention of Lucy Sargent's spousal rights, while on the other hand circumventing those very same spousal rights by ordering that, because the trust has failed, the bulk of its assets should revert to the prior designated beneficiaries."

20. We think it is reasonable so to assume, since under her husband's will Mrs. Sargent would receive only $100. See note 7, *supra.*